COMMONWEALTH *vs.* JOSE RAFAEL BURGOS FRIAS.

No. 97-P-2182.

Essex. March 12, 1999. - July 15, 1999.

Present: BROWN, KAPLAN, & SPINA, JJ.

*Evidence,* Criminal profile, Relevancy and materiality, Expert opinion. *Controlled Substances.*

Evidence at the trial of an indictment for trafficking in cocaine, consisting of expert opinion testimony regarding the general modus operandi of midlevel drug distribution, was not impermissible "profile" testimony and was properly admitted for the jury's consideration. [296-297]

Evidence at the trial of an indictment for trafficking in cocaine, including permissible inferences, was sufficient to warrant the trier of fact to conclude beyond a reasonable doubt that the defendant constructively possessed the cocaine in question either individually or as a joint venturer. [297-298]

INDICTMENT found and returned in the Superior Court Department on December 20, 1989.

The case was tried before *Barbara J. Rouse,* J.

*Anne E. Gowen,* Committee for Public Counsel Services, for the defendant.

*Robert J. Bender,* Assistant District Attorney, for the Commonwealth.

KAPLAN, J. The defendant was indicted on December 20, 1989, for trafficking on August 12, 1989, in a weight of cocaine 200 grams or more. Trial occurred some six years later, on September 13, 1996. The jury found the defendant guilty on both an individual and joint venture basis.

Upon an affidavit of Detective Brian Burokas of the Lawrence police, a "no knock" search warrant issued out of Lawrence District Court authorizing the search of the first floor right rear apartment of 304 Prospect Street, Lawrence. At about 10:00 P.M. on August 12, 1989, five detectives and two uniformed officers, in execution of the warrant, approached the building and made

their way past an unlocked outer door and down a hallway to the designated apartment. One of the police tried the doorknob and found the door locked. Detective Burokas shouted "Police"; this was followed by the thrusting of a battering ram into the door. As the door broke open, the detectives saw, a few feet from the threshold, a double bed. Three men were sitting or lounging on it, facing one another. Each of the men — the defendant was one of them — had before him on the bed a stack of greenbacks and was holding some bills in hand; the men were "working with money . . . counting it, sorting it, splitting it up," as one detective put it. At the intrusion of the police, the men jumped up and started to shove money into their pockets. They were promptly "secured" by the patrolmen.

On the bed in addition to the cash were two rolls of brown, cellophane-like masking tape. The bed was bare of dice, cards, or other gaming paraphernalia.

The apartment, of a type sometimes called "studio," was described by the detectives as "very small"; all contents were within a few steps' distance. Apart from a side bathroom, the apartment consisted of a single area comprising bed space with a closet, and a combination kitchen and living room. There were two unmatched wooden chairs and (perhaps) a small sofa and television.[1]

The detectives began a more or less systematic search and inventory of the limited space. The kitchen area had no food, dishes, pots, pans, kitchen implements, or other indicia of living use; there was a sink, a stove (perhaps), a trash basket; no refrigerator. On the kitchen counter, otherwise bare, the detectives found a wooden mortar, a sifter with white residue, and two boxes with quantities of plastic "sandwich" bags. Near the trash basket was a Newport cigarette box empty except for a very small plastic bag with white powder. (The powder later, as with the contents of other bags, was assayed as cocaine). The detectives turned to the unlocked closet in the bed area and found there two men's shirts in a cleaner's bag, a triple beam balance scale, and two small plastic bags with cocaine. Passing to the bathroom, the detectives found in an unlocked cabinet under the sink a large plastic bag with cocaine mostly in chunk form of a weight (as later found) of 348.91 grams, forty percent pure; also a small plastic bag with cocaine. The cocaine in the

---

[1]Memories were somewhat ragged after the six-year lapse of time, therefore the "perhaps."

four small bags mentioned totaled fifty-one grams, forty-four percent pure.

Reverting to the money on the bed in stacks and held in hand, the amounts fairly attributed to the men by location were $260-$270 to the defendant and $800 and $450 to the others. The cocaine seized had a street value in 1989 of $30,000 to $40,000.

The foregoing is the picture testified to by Detectives Alfred Petralia, Richard Kirkham, and Brian Burokas. Burokas, qualified as an expert in police narcotics work, acquainted the jury with the purposes and uses of the kinds of objects that had been discovered. The functions of a mortar (with pestle) and sifter were to reduce cocaine chunks to powder which, with the introduction of a neutral dilutant, would give the cocaine a low percentage strength suitable for sale on the streets. For such sales, the powder in amounts weighed on a sensitive scale would be packaged in baggies tied off from the corners of the sandwich bags. Burokas went on to speak, over objection, of a class of midlevel drug distribution points.[2] These would usually be located in dense, crowded, centralized neighborhoods. A house or apartment would be used with minimal furnishings. It would be kept spare and anonymous as far as possible to make identification of the operators difficult. Thus any paperwork would be kept out of the place. From higher up in the distribution chain, such a station would receive perhaps a kilogram (2.28 pounds) of chunk cocaine thirty to fifty percent pure, and then would "cut" and bag it to prepare for market. Individual sales were not carried out here; the bags found their sales on the streets.

In cross-examination, the defense pointed out that so-called midlevel stations were not uniform in layout or operations. While agreeing to this, Burokas thought these distributors generally strove to be "very discreet."

On his appeal from the judgment of conviction to this court, the defendant argued in his brief that the judge erred in admitting the portion of Burokas's testimony objected to.[3] He did not raise any question about the sufficiency of the evidence to support the conviction, although the routine motions for required

---

[2] The defendant's objection to this line of testimony was without explanation, and the judge overruled it without comment.

[3] He also made a meritless contention that the judge should have charged on a lesser included offense involving only the four small bags.

findings of not guilty had been made below (and denied). After oral argument of the appeal, the panel, out of abundant caution, in fairness to the defendant, and to avoid later entanglements with possible claims of ineffectiveness of appellate counsel, asked the parties to brief the question of sufficiency, and they have done so.

1. Regarding Burokas's opinion testimony about midlevel points of distribution, the defendant argues (he did not make any explicit argument below) that this amounted to "profile" evidence and should have been excluded. The defendant is mistaken.

Profile evidence characteristically presents to the trier the description of a stereotypical offender — say a child batterer — and suggests that because the defendant conforms to the stylized description, he is by that token proved guilty. Such a line of inference is not permitted because "[a] criminal trial is by its very nature an individualized adjudication of a defendant's guilt or legal innocence. Testimony regarding a criminal profile is nothing more than an expert's opinion as to certain characteristics which are common to some or most of the individuals who commit particular crimes. Evidence of a 'child battering profile' does not meet the relevancy test, because the mere fact that a defendant fits the profile does not tend to prove that a particular defendant physically abused the victim." *Commonwealth* v. *Day*, 409 Mass. 719, 723 (1991). See *Commonwealth* v. *Jackson*, 45 Mass. App. Ct. 666, 671 (1998). Quite different is opinion testimony by an expert offered to attempt to illuminate for the trier the probable or possible meaning of behavior which, as the prosecutor charges, amounts to criminal activity. Thus a police officer with experience in narcotics investigations, qualifying as an expert, may, for instance, describe in general terms how drug transactions are carried out on the street level: this may (or may not[4]) assist the untrained jury in understanding the evidence they have heard of particular conduct on the street. And the same holds, in the present case, of expert testimony about midlevel drug distribution. The distinction between "profile" testimony and testimony of "modus operandi" has been delineated in authority in this jurisdiction, see *Commonwealth* v. *Munera*, 31 Mass. App. Ct. 380, 384-385 (1991); *Commonwealth* v. *Dennis*, 33 Mass. App. Ct. 666, 669 (1992), *S.C.*, 416 Mass. 1001 (1993), and, earlier, in the Federal

[4]See the cross-examination of Burokas noted above.

cases. *United States* v. *Diaz*, 878 F.2d 608, 617-618 (2d Cir. 1989); *United States* v. *White*, 890 F.2d 1012, 1014 (8th Cir. 1989); *United States* v. *Cross*, 928 F.2d 1030, 1050 & n.66 (11th Cir. 1991). Among examples of the admission in evidence of expert testimony on methods of operation, see *Commonwealth* v. *Dennis*, 33 Mass. App. Ct. at 669; *Commonwealth* v. *Gonzales*, 42 Mass. App. Ct. 235, 236-237 (1997); *Commonwealth* v. *Robinson*, 43 Mass. App. Ct. 257, 259-260 (1997). We should add that it would have been improper for Burokas (as it happens, a percipient as well as an expert witness), after testifying on midlevel operations in general terms, to express an opinion about the conformance of the present case to a model — this would trespass on the jury's prerogative as triers. See *Commonwealth* v. *Woods*, 419 Mass. 366, 375 (1995); *Commonwealth* v. *Robinson*, 43 Mass. App. Ct. at 259-266; *Commonwealth* v. *Tanner*, 45 Mass. App. Ct. 576, 579-582 (1998).

We conclude that the judge did not err in overruling the objection to the admission of the detective's testimony.

2. As to the sufficiency of the evidence of trafficking, statutory predicates are possession with intent to distribute. Without straining to spell out actual possession by the defendant or the others, we consider possession of the "constructive" type — knowledge of the drug with the ability and intention to exercise dominion and control. See *Commonwealth* v. *Sabetti*, 411 Mass. 770, 778 (1992); *Commonwealth* v. *Cruz*, 34 Mass. App. Ct. 619, 621 (1993). The knowledge may be established by inference from the circumstances. See *Commonwealth* v. *Santiago*, 30 Mass. App. Ct. 207, 217 (1991); *Commonwealth* v. *Cruz*, 34 Mass. App. Ct. at 621; *Commonwealth* v. *Sanchez*, 40 Mass. App. Ct. 411, 415-417 (1996). And so here.

As the police enter, the three men are caught, as the jury could find, in sight of drug apparatus and in reach of a quantity of the drug, counting and dividing cash proceeds as the culmination of drug transactions. These are strong indications of prohibited trafficking. The case is clinched against the defendant when the jury ascribe meaning to the tableau, as they may, by reference to the expert opinion received in evidence. The location,[5] setting, and operational details correspond, so the jury could find, to the model of a midlevel distribution station as

---

[5] The men, as expected, did not reside at the apartment. When booked, the defendant said he lived at 269 Prospect Street, and Hector Gomez, one of the others, told the police he lived on the second floor of 304 Prospect.

described by the expert. The jury could find here a kind of cocaine mill. One expects the inventory of cocaine to be supplied to the mill from time to time in relatively modest amounts, where it is regularly depleted by being ground, diluted, weighed, bagged, and sealed and passed along for disposal at street levels. At any moment in this transit, there is a stash aboard, perhaps loosely hidden, in an amount determined by the recency of the delivery of the inventory, the stage of the operations upon it, and the flow of the finished goods to the outdoors. Of this process, the operators could be found cognizant and in it complicit, with commonsense inference[6] establishing the statutory requisites of possession and — very plainly — the intent to distribute, so as to render the defendant (as well as the others, if charged) guilty of trafficking in the weight of the drug found in the apartment at the time of the arrests.[7] This case in the end is but an example of establishing (constructive) possession of drugs not in open view by means of circumstantial evidence, here aided by expert opinion. See, for example, *Commonwealth* v. *Montanez*, 410 Mass. 290, 304-306 (1991); *Commonwealth* v. *Padilla*, 42 Mass. App. Ct. 67, 74 (1997); *Commonwealth* v. *Gonzales*, 42 Mass. App. Ct. at 237-241. Contrast *Commonwealth* v. *Caraballo*, 33 Mass. App. Ct. 616, 618-620 (1992).

We need add that on the evidence as the jury could find it the defendant was guilty individually and as part of a joint venture in which each venturer could serve as principal. See *Commonwealth* v. *Ortiz*, 424 Mass. 853, 859-860 (1997). Cf. *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 618-620 (1990), *S.C.*, 410 Mass. 1005 (1991).[8]

*Judgment affirmed.*

---

[6]"Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." *Commonwealth* v. *Kennedy*, 426 Mass. 703, 707-708 (1998), quoting *Commonwealth* v. *Drew*, 4 Mass. App. Ct. 30, 32 (1976).

[7]As to figuring quantities, see *Commonwealth* v. *Rodriguez*, 415 Mass. 447, 452 (1993).

[8]*Arias* is similar to the present case but the fact that bags of the drug were in sight of the occupants (whereas here only the residue on the sifter was thus visible) made proof of possession fall more readily into the usual pattern.