COMMONWEALTH *vs.* NELSON GONZALEZ
(and five companion cases[1]).

Hampden. April 7, 2008. - August 13, 2008.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, CORDY, & BOTSFORD, JJ.

*Controlled Substances. Joint Enterprise. Evidence,* Constructive possession, Joint enterprise. *Practice, Criminal,* Verdict, Findings by judge.

At the jury-waived trial of indictments charging the defendants with possession of heroin with intent to distribute and with doing so within one hundred feet of a park or playground, the judge did not err in concluding that the defendants were in constructive possession of the heroin, where the evidence warranted an inference that the defendants knew that the apartment in which they were present contained, and was used as a base for selling, heroin and cocaine, and where the evidence further supported the inference that the defendants had the ability and intention to exercise dominion and control over the drugs in the apartment; further, the evidence supported the judge's conclusion that the defendants were participants in a joint venture. [146-150] CORDY, J., dissenting, with whom MARSHALL, C.J., joined.

At a jury-waived criminal trial, the judge's factually inconsistent findings (i.e., guilty of possession of heroin with intent to distribute and of doing so within one hundred feet of a park or playground, but not guilty of trafficking in cocaine found in the same locations) did not violate the defendants' rights under the due process clause of the United States Constitution or art. 12 of the Massachusetts Declaration of Rights. [150-155] CORDY, J., concurring, with whom MARSHALL, C.J., joined.

INDICTMENTS found and returned in the Superior Court Department on August 18, 2004.

The cases were heard by *Peter A. Velis,* J.

The Supreme Judicial Court granted applications for direct appellate review.

*Nadell Hill* for Mariano L. Gomez.

*Dennis M. Powers* for Nelson Gonzalez.

*Michael J. Fellows* for Jonathan S. Maldonado.

[1]One against Nelson Gonzalez, and two each against Jonathan S. Maldonado and Mariano L. Gomez.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

BOTSFORD, J. Following a bench trial, the three defendants — Nelson Gonzalez, Jonathan S. Maldonado, and Mariano L. Gomez — were convicted of possessing heroin with intent to distribute, in violation of G. L. c. 94C, § 32 (*a*), and violating the controlled substance law within one hundred feet of a park or playground, in violation of G. L. c. 94C, § 32J. They were acquitted of trafficking in cocaine, in violation of G. L. c. 94C, § 32E (*b*) (2). We granted the defendants' applications for direct appellate review to consider their contention that the verdict of not guilty on the trafficking charge is inconsistent with the guilty verdict on the charge of possessing heroin with intent to distribute, and that a judge may not render inconsistent verdicts. The defendants also argue that there was insufficient evidence presented at trial to support a conviction for possession of heroin with intent to distribute. We affirm.

*Background.* The judge could have found the following facts. In the summer of 2004 the Holyoke police department began investigating suspected drug dealing at 101 Beech Street, a ten-unit residential apartment building in Holyoke next to a public park. During a ten to fifteen day period, officers conducting surveillance observed a number of people enter the building for very short periods of time, activity that the officers knew to be associated with narcotics transactions. The officers did not observe which apartment unit or units the visitors entered. As part of the investigation the police arranged for a confidential informant to purchase drugs in the building. The informant reported that the purchases[2] occurred in apartment 4L, that he purchased the drugs from one Geraldo Ruiz, and that another man, Hispanic, five feet, nine inches tall, and with light complexion and short black hair, was present during the purchases.[3]

On August 11, 2004, the officers applied for and obtained a search warrant for apartment 4L. Within the four hours before the officers entered the apartment, the same informant made a final controlled purchase in the apartment. Thirteen officers as-

---

[2]The informant made a number of purchases before August 11, 2004, the date of the search warrant.

[3]Ruiz was never arrested, and at the time of the trial the police did not know of his whereabouts. The other man was never identified.

sembled at 101 Beech Street to execute the warrant. When the nine who went in the front door of the building arrived at the fourth-floor door to apartment 4L, they knocked and identified themselves as police officers. They heard noises from within that at least one officer described as "scurrying." After between ten and thirty seconds elapsed, they forced the door open with a battering ram.

Immediately after entering the apartment several of the officers came to the living room, where they saw eight men. When Emilio Garcia, who was sitting on a couch, was ordered to lie on the floor, he dropped a key that was then partially obscured under his body. The key fit the lock to the apartment's front door. Erik Montalban was standing in front of a couch. When he was ordered to the floor, he dropped a key attached to a small plastic tag and a small bag that itself contained several empty plastic sandwich bags of a kind used to package cocaine and marijuana. When Luis Pimentel was raised from the floor after being handcuffed, three small, clear packets containing cocaine were found on the floor where he had been lying. All eight men were placed in handcuffs and were read their Miranda warnings. Subsequent searches of all eight revealed the following: Garcia had $116 on his person; Montalban had $961 in cash consisting mostly of one, five, ten, and twenty dollar bills; Pimentel had ten bags of cocaine and fifty-five dollars; Jose Acevedo possessed $200 and a set of keys; Jorge Davila had $187 in small denominations in his pockets; the defendant Gonzalez had $1,046 on his person and a set of keys to apartment 5L, the apartment above 4L, where he said he lived; the defendant Maldonado had $1,740; and the defendant Gomez had a total of $2,604 in his pockets.

The apartment was searched, and the four officers at the rear door were brought in. Officers testified that the apartment was sparsely furnished: there was a television, couch and chair or loveseat in the living room, a box spring and mattress in one bedroom, and a table and some chairs in the kitchen. A plastic key holder was found that contained five baggies of cocaine weighing a total of 6.09 grams. Between the couch and the wall, and visible from the middle of the room, was a white plastic bucket with its lid placed loosely on top. Inside the bucket was 11.02 grams of "crack" cocaine packaged in six bags that were bundled together, twenty-two grams of cocaine packaged in 125

bags, and nineteen additional bags of cocaine that, according to expert testimony, would sell for between sixty and sixty-five dollars each. Also in the bucket were seventy-one glassine packets of heroin, each marked "777," that would sell for ten dollars each, and $3,184. Behind the couch the officers found $177 in denominations of twenties and smaller, a film canister containing five bags of crack cocaine that would sell for thirty to fifty dollars each, and a tin box containing twenty-five bags of crack cocaine that would sell for twenty dollars each, and ten packets of heroin stamped "777." Attached to the inside of the front door were two heavy metal chains wrapped in electrical tape. The chains were not attached when the officers entered the apartment, and Officer Roger Goudreau testified that had they been, the officers would have been unable to enter. Above the dropped ceiling of the hallway running between the living room and the kitchen the officers found a box of sandwich bags. The key dropped by Montalban opened a closet in the common hallway on the fourth floor. In the closet was a pencil case containing four bags of cocaine worth approximately $120, homemade spoons, one of which had cocaine residue on it, black and clear baggies, and razor blades. A search, pursuant to a warrant, of apartment 5L revealed a document in the defendant Gonzalez's name and bearing the address of the apartment; $2,000; and a scale of the kind sometimes used to measure narcotics.

All eight men were charged with trafficking in between twenty-eight and one hundred grams of cocaine, possessing heroin with intent to distribute, and violating the controlled substance law within one hundred feet of a public park. They were tried together in a single jury-waived trial between January 23 and 26, 2006. Gomez was the only defendant to testify. He testified that he had recently sold a motor vehicle to someone who also lived at 101 Beech Street but in a different apartment than 4L, and that after collecting money from her he came to visit in apartment 4L. He also testified that he often keeps in his pockets the cash proceeds of his job at a garage. On January 31, 2006, the judge found five of the defendants, Pimentel, Montalban, Garcia, Davila, and Acevedo, guilty of all charges. The judge found the three defendants before this court, Gomez, Gonzalez, and Maldonado, not guilty of trafficking in cocaine, but guilty of possessing heroin with

intent to distribute and violating the controlled substance law within one hundred feet of a public park. This court granted the applications for direct appellate review of these three defendants. The appeals of the remaining five defendants remain in the Appeals Court.

*Sufficiency of the evidence.* The three defendants before this court argue that there was insufficient evidence to prove that they were in possession of the heroin found in the apartment. The test we apply is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), quoting *Jackson* v. *Virginia*, 443 U.S. 307, 318-319 (1979). See *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 617 (1990), *S.C.*, 410 Mass. 1005 (1991). The Commonwealth concedes that because the judge's verdict did not reveal whether he relied on the theory of joint venture or constructive possession, the evidence must be sufficient to support both theories. See *Commonwealth* v. *Flynn*, 420 Mass. 810, 818-819 (1995).

"Proof of constructive possession requires the Commonwealth to show 'knowledge coupled with the ability and intention to exercise dominion and control.' " *Commonwealth* v. *Boria*, 440 Mass. 416, 418 (2003), quoting *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 409 (1989). "Proof of possession of a controlled substance may be established by circumstantial evidence, and the inferences that can be drawn therefrom." *Commonwealth* v. *Brzezinski*, *supra*, quoting *Commonwealth* v. *LaPerle*, 19 Mass. App. Ct. 424, 426 (1985). "Whether an inference is warranted or is impermissibly remote must be determined, not by hard and fast rules of law, but by experience and common sense." *Commonwealth* v. *Arias*, 29 Mass. App. Ct. at 618, quoting *Commonwealth* v. *Drew*, 4 Mass. App. Ct. 30, 32 (1976). "While presence in an area where contraband is found 'alone cannot show the requisite knowledge, power, or intention to exercise control over the [contraband] . . . presence, supplemented by other incriminating evidence, will serve to tip the scale in favor of sufficiency.' " *Commonwealth* v. *Arias*, *supra*, quoting *Commonwealth* v. *Brzezinski*, *supra* at 409, 410.

The evidence warranted an inference that the defendants

knew that the apartment in which they were present contained, and was used as a base for selling, heroin and cocaine. When Pimentel was lifted from the floor, after being ordered there on the officers' initial entry, three packets of cocaine were found underneath his body. The judge could reasonably have inferred that the three packets were in plain sight and visible to the defendants just before the officers arrived at the apartment. Furthermore, the location of the larger quantities of heroin and cocaine found in the living room, some of it in a loosely covered bucket next to the couch and the rest in and beside a tin box hidden behind the couch, coupled with the testimony that the officers heard "scurrying" immediately before their entry, suggests that those drugs were hidden hastily on the officers' arrival, and that they, too, were plainly visible in the room before the door was opened with the aid of a battering ram. The front door of the sparsely furnished apartment had heavy barricades that, although not in place at the time of the search, clearly suggested that the apartment was regularly used for illegal activity, and more particularly, in light of the drugs within, illegal drug activity. See *Commonwealth* v. *Velasquez*, 48 Mass. App. Ct. 147, 150 (1999) (barricade at rear door of apartment "tended to establish that it was a drug trading post"); *Commonwealth* v. *Antonio*, 45 Mass. App. Ct. 937, 938 (1998) (citing defendant's presence in sparsely furnished, fortified apartment where drugs were found); *Commonwealth* v. *Arias*, 29 Mass. App. Ct. at 619 (citing defendants' presence in sparsely furnished and "heavily barricaded apartment").

Of course, mere presence in the apartment with knowledge that drugs are present is not enough to show constructive possession. *Commonwealth* v. *Boria*, 440 Mass. at 421. But the evidence also supports the inference that the defendants had the ability and intention to exercise control over the drugs in the apartment. The defendants' presence in a room with such large quantities of drugs and cash, much of which, as stated, the judge reasonably could have concluded was in plain view shortly before the officers opened the door, suggests that they were closely involved in the illegal drug sales conducted from the apartment. See *Commonwealth* v. *DeJesus*, 48 Mass. App. Ct. 911, 911-912 (1999) (defendant's presence in small room with contraband in plain view suggests "a close connection between him and the

heroin sales operation"). Because the sparse furnishings and barricades suggest that the apartment was primarily used for drug transactions, they also suggest that all of those present were involved in the activity, not simply aware of it. See *Commonwealth v. Antonio*, 45 Mass. App. Ct. at 938 ("a reasonable inference of guilt may be made from the defendant's presence in a sparsely furnished, fortified apartment where drugs and drug packaging were found"); *Commonwealth v. Arias*, 29 Mass. App. Ct. at 619 (finding defendants' presence in sparsely furnished and "heavily barricaded apartment" as two factors that provided "potent evidence of an intention by the defendants to exercise dominion and control of the premises and its contents"). The unusually large amounts of cash found in the possession of the three defendants — substantially more than found on any of the other men — additionally support a finding that they were partners in the enterprise, and in constructive possession of the drugs.[4] See *Pena v. Commonwealth*, 426 Mass. 1015, 1018 (1998) (petitioner's arrest "with a large amount of cash on his person . . . strongly suggests his direct participation in the drug distribution"); *Commonwealth v. Frias*, 47 Mass. App. Ct. 293, 294-295, 297-298 (1999) (sufficient evidence because jury permitted to "ascribe meaning to the tableau" of defendants dividing up cash totaling $1,500); *Commonwealth v. Arias, supra* at 615 n.4, 619 n.10 (between $44 and $425 found on each of five defendants, coupled with presence in apartment with drugs, sufficient evidence of possession).[5]

In sum, this is not a case of mere presence. The large sums of money on each of the three defendants, coupled with their close

---

[4]Gomez argues that because he testified about a legitimate source for the money found on his person, and the money was therefore not "unexplained," it is less significant as a factor tending to show his possession of the drugs. The judge was not required to credit Gomez's explanation for the source of the money, and was free to consider Gomez's possession of over $2,000 as evidence of his involvement in illegal drug activity. See *Commonwealth v. Miller*, 4 Mass. App. Ct. 379, 384 (1976).

[5]Gonzalez was linked to the sale of the drugs in an additional way — he carried a key to apartment 5L and a document was found there with his name on it. The items found in that apartment (an electronic scale, and $2,000, but no drugs) provided further evidence of Gonzalez's involvement in illegal drug sales connected to apartment 4L, but the $1,046 found on his person, coupled with presence in apartment 4L, was sufficient to support his conviction.

proximity to at least some of the hiding places of the drugs, allow the reasonable inference that each of the three had the ability and intention to exercise dominion and control over the drugs found in the living room.[6]

The same evidence permits a finding that the defendants were participants in a joint venture because they were (1) present at the scene of the crime, (2) with knowledge that others intended to commit the crime or intending themselves to commit the crime, and (3) by agreement were willing and available to help the others if necessary. See *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988), and cited cases.

The defendants rely on several cases in which the Appeals Court held that there was insufficient evidence to find constructive possession even though in each case a defendant was found in proximity to drugs and in possession of significant amounts of money. See *Commonwealth* v. *Navarro*, 39 Mass. App. Ct. 161 (1995); *Commonwealth* v. *Caterino*, 31 Mass. App. Ct. 685 (1991). In *Commonwealth* v. *Navarro, supra,* the police arrived at an apartment while the defendant, not a resident of the apartment, was inside. The defendant "lunged" for a purse on the bed, and drugs, a syringe, a hypodermic needle, and $460 were found in the purse. In a subsequent search pursuant to a warrant, drugs packaged with a logo matching the logo on the drugs found in the purse were found in a blanket on the bed. The Appeals Court concluded there was insufficient evidence to show constructive possession of the drugs found in the blanket. In *Commonwealth* v. *Caterino, supra,* the defendant and his female friend were both the subjects of an ongoing narcotics investigation by the police,

---

[6]In concluding that the evidence was insufficient to warrant conviction of the three defendants before the court, the dissent gives no consideration to the fact that the three defendants were part of a group of eight men, all together in a room with substantial amounts of heroin, cocaine, and cash, and with minimal furniture. It is obviously necessary to consider the sufficiency of the evidence with respect to each defendant individually. Nevertheless, the fact that each of these defendants was part of the group of eight present in the single room with the drugs and cash is clearly relevant to an assessment of the over-all sufficiency of the evidence against each of them. And, as stated in the text, of particular relevance is the fact that while others in the room were more physically connected to the heroin and cocaine than these three defendants, each of these defendants had in his possession significantly more cash than any of the other five men.

and the police obtained search warrants for both the friend's and the defendant's apartments. The defendant was in the bathroom at his friend's apartment when the police arrived with a search warrant for that apartment, and statements by the friend to him in the presence of the police made it clear that the defendant was well aware of the drugs in her apartment. The defendant was carrying $735, as well as a pill of the same kind found in the apartment, and there was evidence that a witness knew she could contact the defendant through the female friend's house. The Appeals Court concluded that although there was evidence of the defendant's awareness of the drugs in the friend's apartment, and the large amount of cash in his pocket was evidence of illegal activity, there was insufficient evidence that the illegal activity was connected to the drugs in that apartment. The defendants also cite *Commonwealth* v. *Amparo*, 43 Mass. App. Ct. 922 (1997). The defendant in that case, along with two other men, were in a sparsely furnished apartment in which heroin was found hidden in a vacuum cleaner, and each of the three men carried a pager. A grinder containing heroin residue, four cellular telephones, a digital scale, three calculators, and $1,230 were also found in the apartment. The police, armed with a search warrant, tried to open the apartment's front door but were unable to because someone inside was holding it shut. As the police then prepared to force open the back door, the defendant and the two other men came running out of that door and ran into the police. The Appeals Court held that although there was expert evidence that pagers are "frequently associated with the sale of controlled substances," there was insufficient evidence to prove that the defendant had constructive possession of the drugs in the apartment. To some extent, these cases are factually distinguishable from the instant case, but to the extent that the cases are inconsistent with this opinion, we do not follow them.

*Inconsistent verdicts and findings.*[7] Our rule is well settled that, in cases tried before a jury, "mere inconsistency in verdicts, one of which is an acquittal, will not render the verdict of guilty erroneous even though such inconsistency may have indicated

---

[7] We use the term "verdict" to refer to a jury's determination that a defendant is guilty or not guilty of a particular charge, and the term "finding" to refer to such a determination by a judge. See Mass. R. Crim. P. 25 (b) (2), as amended, 420 Mass. 1502 (1995).

the possibility of compromise on the part of the jury."[8] *Commonwealth* v. *Scott*, 355 Mass. 471, 475 (1969). "The rule recognizes the power, possibly salutary, of juries to compromise and to act out of leniency." *Commonwealth* v. *Diaz*, 19 Mass. App. Ct. 29, 33 (1984). The defendants argue that factually inconsistent findings rendered by a judge in a jury-waived trial present a different situation, and, unlike inconsistent jury verdicts, may not be sustained. The question whether a judge's finding is subject to the same rule is an issue of first impression in this Commonwealth.

The defendants suggest that we adopt the rule described in Judge Friendly's opinion in *United States* v. *Maybury*, 274 F.2d 899, 901-904 (2d Cir. 1960), one of three opinions in that case decided by a divided three-judge panel of the United States Court of Appeals for the Second Circuit. Judge Friendly explained that while inconsistent jury verdicts are acceptable because they may be the result of leniency, or of compromises made to achieve unanimity, or, more poetically, of the unique function of the jury as "the voice of the country," no similar rationale justifies inconsistent findings resulting from a trial before a judge. *Id.* at 902-903. "While the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure lenity, the judge is hardly the 'voice of the country,' even when he sits in the jury's place. If he deems an indictment multiplicious, he has only to say so, and the time for him to exercise any 'lenity' that he deems warranted is on sentence." *Id.* at 903.

---

[8]Factually inconsistent verdicts occur when two or more verdicts in a single case, considered together, suggest inconsistent interpretations of the evidence presented at trial. See *Commonwealth* v. *Elliffe*, 47 Mass. App. Ct. 580, 584 (1999); *Commonwealth* v. *Simcock*, 31 Mass. App. Ct. 184, 196-197 (1991). A factually inconsistent verdict is distinct from the legally inconsistent verdict that arises when there exists no set of facts that the government could have proved in the particular case that would have resulted in the verdict at issue. See *Commonwealth* v. *Walker*, 442 Mass. 185, 203 (2004), quoting *Commonwealth* v. *Elliffe*, *supra* ("A defendant is entitled to relief 'only where verdicts are legally inconsistent — i.e., where, removed from the factual context of the particular case, the government could not possibly have proved the elements of both crimes with respect to the defendant"); *Commonwealth* v. *Nascimento*, 421 Mass. 677, 683 (1996) (inconsistent in law for defendant to be convicted both of stealing property and of receiving same property). Such legally inconsistent verdicts cannot be sustained, even when they are rendered by a jury.

The rule advocated by Judge Friendly and effectively adopted in the *Maybury* case is not required by the United States Constitution. *Harris* v. *Rivera*, 454 U.S. 339, 348 (1981). Some courts have adopted the rule set out in the *Maybury* case that inconsistent findings issued by a judge on different charges against a defendant in a single trial cannot stand, and have either reversed or remanded a judge's guilty finding when it was inconsistent with a finding of not guilty on a separate charge at issue in the same trial. See, e.g., *State* v. *Meyer*, 17 Kan. App. 2d 59, 70-71 (1992) (reversing conviction of issuing forged instrument because defendant also found not guilty of forging same instrument); *State* v. *Williams*, 397 Md. 172, 190 (2007) (reversal of convictions for attempted robbery with dangerous weapon and assault because defendant found not guilty of possessing handgun allegedly used); *Shell* v. *State*, 307 Md. 46, 57-58 (1986) (reversing conviction of use of handgun in commission of felony because defendant was found not guilty of underlying felony); *People* v. *Williams*, 99 Mich. App. 463, 464-465 (1980) (reversing conviction because defendant was found not guilty of factually related charge); *Akers* v. *Commonwealth*, 31 Va. App. 521, 530-532 (2000) (reversing conviction of unlawful wounding because defendant was found guilty of lesser included offense of factually linked charge). The rule, however, has not been universally adopted. See *United States* v. *Chilingirian*, 280 F.3d 704, 711 (6th Cir. 2002); *United States* v. *West*, 549 F.2d 545, 553 (8th Cir.), cert. denied, 430 U.S. 956 (1977); *State* v. *Garza*, 196 Ariz. 210, 212-213 (Ct. App. 1999); *People* v. *McCoy*, 207 Ill. 2d 352, 358 (2003); *Fister* v. *Commonwealth*, 133 S.W.3d 480, 481 (Ky. Ct. App. 2003).[9] See also Annot., Inconsistency of Criminal Verdict as Between Different Counts of Indictment or Information, 18 A.L.R.3d 259 § 6 (1968).

A common concern expressed by courts adopting the *Maybury* rule is the fear that inconsistent findings on separate charges by a judge might represent confusion or mistake on the part of the judge, and thus call into question the soundness of the guilty

---

[9]It is somewhat difficult to evaluate these cases for purposes of determining an appropriate rule in the Commonwealth because it appears that some of the cases presented legally, as opposed to factually, inconsistent verdicts, and as previously indicated, a legally inconsistent verdict or finding cannot be sustained in Massachusetts whether rendered by a jury or a judge. See note 8, *supra*.

finding. See *United States* v. *Maybury*, 274 F.2d at 905 ("we can have no confidence in a judgment convicting Maybury of one crime when the judge, by his acquittal of another, appears to have rejected the only evidence that would support the conviction here"); *Akers* v. *Commonwealth*, 31 Va. App. at 532, quoting *Haynesworth* v. *United States*, 473 A.2d 366, 372 (D.C. 1984) (apparent inconsistency likely result of confusion, indicating defendant was not proved guilty beyond reasonable doubt). See also *People* v. *O'Malley*, 108 Ill. App. 3d 823, 831 (1982) ("We believe that the vice in inconsistency is that it implies confusion on the part of the trial judge sitting as the finder of fact. Confusion suggests that the defendant was not proved guilty beyond a reasonable doubt"). To ameliorate this concern, some courts have held that when a review of the record and the judge's findings reveals a rational reason for the apparent inconsistency, or fails to demonstrate any confusion on the part of the judge, the findings may be sustained. See *Haynesworth* v. *United States*, *supra* at 371; *People* v. *O'Malley*, *supra* at 833. Rational reasons may include a judge's expressions of doubt as to the guilt of a defendant on the charge, or evidence of a judge's attempted leniency. See *Harris* v. *Rivera*, 454 U.S. at 347 (likely source of apparent inconsistency is judge's "doubt about the guilt of one defendant that he might or might not be able to articulate in a convincing manner"); *People* v. *O'Malley*, *supra* (judge's leniency provides rational reason for apparently inconsistent findings).

Still other courts have adopted a uniform rule affirming, although discouraging, inconsistent judicial findings. The reasons for adopting such a rule vary. Some courts have simply concluded that a judge's inconsistent findings are no more improper than inconsistent verdicts rendered by a jury. See *United States* v. *Chilingirian*, 280 F.3d at 711; *United States* v. *West*, 549 F.2d at 553. But other courts have reasoned that the most likely explanation for any inconsistency is judicial leniency and therefore, however objectionable the practice may be, it presents no reversible error. See *State* v. *Garza* 196 Ariz. at 212-213; *People* v. *McCoy*, 207 Ill. 2d at 358. We believe that this is the most appropriate approach. Factually inconsistent findings should be avoided, but if a judge nonetheless renders findings that appear factually inconsistent, the judge should support the result with an explanation of the apparent inconsistency, a course of action that

unfortunately the judge did not follow in the present case. We agree with the court in *Maybury* that it does not "enhance respect for law or for the courts" to allow a judge to "indulge in 'vagaries' in the disposition of criminal charges that, for historic reasons, has been granted the jury." *United States* v. *Maybury*, 274 F.2d at 903. However, apparent inconsistency in a trial judge's findings alone is insufficient to create an inference of irregularity. See *Harris* v. *Rivera*, 454 U.S. at 347. The most likely sources of apparent inconsistency are rational ones, such as judicial leniency. Clearly, leniency should not be exercised through judicial verdicts; the *only* appropriate place for judicial leniency is in sentencing. Nevertheless, leniency is not an error that prejudices the defendant, and no reversal or new trial is required.

Two of the defendants (Gomez and Maldonado) argue that even though inconsistent verdicts or findings do not violate the due process clause of the United States Constitution, they violate art. 12 of the Massachusetts Declaration of Rights. In certain circumstances, we have found the rights of our citizens under art. 12 to be more expansive than those guaranteed by the Federal Constitution. See, e.g., *Commonwealth* v. *Mavredakis*, 430 Mass. 848, 858 (2000) (art. 12 provides broader protection from self-incrimination than does Fifth Amendment to United States Constitution). "In deciding whether to interpret art. 12 more expansively than the Fifth Amendment, we look to the text, history, and our prior interpretations of art. 12 . . . ." *Id.* Making no reference to the history of art. 12, and providing no examples of prior interpretations of art. 12 to support the broad interpretation they seek, the defendants rest their argument entirely on the text of art. 12, which provides that no person shall be "deprived of his life, liberty, or estate, but by the judgment of his peers, or the law of the land." According to the defendants, this phrase provides a more explicit injunction against inconsistent verdicts or findings than the language found in the due process clause of the Fifth Amendment, which requires that no person shall be "deprived of life, liberty or property, without due process of law." Particularly as applied to a judge rather than a jury of citizens from the community — a defendant's "peers" — we see no reason why this slight difference in language, considered by itself and without reference to the history of either document or our prior cases

interpreting art. 12, should result in a different constitutional requirement.

The judge's findings in this case appear to be factually inconsistent. The evidence was that in every location in which there was heroin, cocaine was also found. In order to have found the defendants guilty of possession of heroin with intent to distribute, the judge must have determined that they constructively possessed the heroin hidden in the bucket or behind the couch, or knew of the locations of those drugs and acted in ways sufficient to satisfy the requirements of the Commonwealth's alternative joint venture theory. Yet because the defendants were found not guilty of trafficking in cocaine, the judge must have found that they did not constructively possess, or participate in a joint venture to distribute, the cocaine found in the same locations.[10] But the inconsistency is a factual, not a legal, one, and does not require reversal.[11]

*Judgments affirmed.*

[10]Because the other five men in the apartment were found guilty of trafficking in more than twenty-eight but less than one hundred grams of cocaine, the judge must have found that the quantity of cocaine in the bucket and behind the couch was sufficient to support the trafficking conviction of which these three defendants were acquitted. There was a small amount of cocaine found elsewhere in and around the apartment, but there was no evidence of amounts sufficient to support those convictions.

[11]We can discern no reason for the apparently inconsistent findings except that they are the result of the judge's effort at leniency. The cocaine charge, on which these defendants were acquitted, carried a mandatory minimum sentence of five years, G. L. c. 94C, § 32E (*b*) (2), whereas the violation of controlled substance laws within one hundred feet of a park had a mandatory minimum of at least two years, to be served from and after the sentence on the underlying drug offense, G. L. c. 94C, § 32J, and the heroin conviction carried a nonmandatory minimum sentence of not more than ten years, G. L. c. 94C, § 32 (*a*). The three defendants before this court were each sentenced to either three or six months in a house of correction for the violation of the heroin offense, and a mandatory two years in the house of correction from and after that sentence for the violation of the park zone statute, whereas the five other defendants were sentenced to five years in the State prison for cocaine trafficking. It appears that the judge's findings were designed to reach the desired sentence within the limitations imposed by the applicable mandatory minimum sentences. If indeed this was the judge's rationale for reaching the inconsistent findings he did, it was an improper exercise of his power to render the findings in a jury-waived trial. Nevertheless, it is not a wholly irrational result, and the three defendants are not entitled to reversal.

CORDY, J. (concurring in part and dissenting in part, with whom Marshall, C.J., joins). I concur in the court's holding that factually inconsistent verdicts rendered by a judge in a jury-waived trial are insufficient alone to create an inference of irregularity requiring reversal or a new trial. I also agree that a judge rendering such verdicts should support them with findings explaining the apparent inconsistency; and that while the judge did not follow that course of action in this case, reversal is not required on that ground.

Reversal is required, however, because the evidence as to each of these three defendants (Nelson Gonzalez, Jonathan S. Maldonado, and Mariano L. Gomez) is insufficient to prove that they constructively possessed the heroin found in the apartment in which they were arrested. In concluding otherwise, the court stretches our precedent to the breaking point (shedding itself of precedent to the contrary); devalues the protections afforded by our law of constructive possession; and undermines the principle that "[m]ere presence in the vicinity of a controlled substance, even if one knows that the substance is there, does not amount to possession." *Commonwealth* v. *Booker*, 31 Mass. App. Ct. 435, 437 (1991). See *Commonwealth* v. *Boria*, 440 Mass. 416, 418-419 (2003) ("Living in a place where drugs are in plain view and being sold, or associating with someone who controls the contraband is not enough to prove constructive possession"). I respectfully dissent.

The evidence is not complicated. The police received information that drugs were being sold from apartment 4L, and began an investigation. The building was placed under surveillance for a ten to fifteen day period, and a police informant made several purchases of cocaine at the apartment from an individual identified as Geraldo Ruiz. Ruiz is not one of the defendants in this case. There is no evidence that any of the defendants were present in the apartment when the sales were made, nor is there evidence that any were observed at or near that location while it was under surveillance. The police obtained a warrant to search apartment 4L, naming as its targets Ruiz; Jorge Davila, a tenant of the apartment subsequently charged with trafficking and possession along with the defendants[1]; and an unidentified "slender"

---

[1]At the hearing on a motion to suppress, one of the building's owners testified that Jorge Davila was a tenant of apartment 4L.

Hispanic man who was present in the apartment with Ruiz at the time the sales were made to the informant. The Hispanic man is not one of the defendants. Several hours before executing the warrant, the informant was sent back to the apartment to make an additional purchase, which he did. The defendants were again not present nor observed when that purchase was made.

The only evidence connecting the defendants to the apartment was their presence there when the police broke down the door at 6:30 P.M. on August 11, 2004. They were, at that time, in the living room watching television with five other men. One of the five, Emilio Garcia, had a key to the apartment in his possession. A second, Erik Montalban, had a key to a locked closet in the hallway outside the apartment in which drugs and packaging tools and materials were discovered in the course of the search. A third, Davila, was a tenant of the apartment.

The defendants did not have any drugs on their persons when searched. The heroin, which the defendants are charged with possessing with intent to distribute, was found concealed in two places in the living room. A covered bucket contained seventy-one glassine packets of heroin; it was located on the floor between the end of one of two couches in the room and the corner of the room.[2] A separate tin box contained ten packets of heroin; it was found behind a couch, directly behind the place where Garcia (the person with the apartment key) was sitting when the police burst into the apartment. There was no evidence that the defendants were sitting (or standing) anywhere near the two covered containers in which the packets of heroin were eventually found. The only link between the defendants and the heroin is the same evidence linking them to the apartment: their presence there at the time of the warrant's execution.

The Commonwealth argues, and the court agrees, that the cash that the defendants had in their possession links them to the heroin. Neither this court nor the Appeals Court has ever concluded that presence and cash are, without more, sufficient to establish constructive possession of an illegal substance, that is, knowledge of the presence of drugs with the ability and

---

[2]There was testimony from a number of police officers about the configuration of the room. Although not always consistent, there appeared to be a consensus that there were at least two couches in the living room, one of which is occasionally referred to as a "love seat."

intention to exercise dominion and control over the property. See, e.g., *Commonwealth* v. *Navarro*, 39 Mass. App. Ct. 161 (1995) (evidence of constructive possession of drugs found in apartment of another, where defendant was staying, insufficient even though she had small quantity of similarly packaged and labeled drugs and $460 in cash in her pocketbook located in same room where large quantity of drugs found); *Commonwealth* v. *Caterino*, 31 Mass. App. Ct. 685 (1991) (evidence that defendant had $735 in his possession, was present, and had knowledge of drugs stored in apartment insufficient to establish constructive possession).

Cases in which cash has been considered a factor in establishing constructive possession have involved additional evidence of dominion and control not present here.[3] See *Pena* v. *Commonwealth*, 426 Mass. 1015 (1998) (evidence sufficient where petitioner was only person present in apartment he shared with brother, large quantity of cash, drugs, and drug sale records were concealed in bedroom where he was found lying down, and there was $1,600 of cash in his wallet); *Commonwealth* v. *Brzezinski*, 405 Mass. 401, 410 (1989) (evidence of constructive possession sufficient where defendant rented apartment, was present when drugs found both in plain view and concealed there, ran to closet where most of cocaine and cocaine paraphernalia were hidden when police entered apartment to execute search warrant, and had $450 hidden inside his underwear "between his buttocks"); *Commonwealth* v. *Frias*, 47 Mass. App. Ct. 293 (1999) (evidence sufficient where police executed

---

[3]The court disavows the holdings in several Appeals Court cases. *Ante* at 149-150. See *Commonwealth* v. *Navarro*, 39 Mass. App. Ct. 161 (1995); *Commonwealth* v. *Caterino*, 31 Mass. App. Ct. 685 (1991). See also *Commonwealth* v. *Amparo*, 43 Mass. App. Ct. 922, 923 (1997), quoting *Commonwealth* v. *Caterino*, *supra* at 689 (evidence insufficient where defendant in possession of pager arrested along with two others fleeing from apartment where drugs found concealed; and no evidence that defendant "rented, occupied, spent a great deal of time at or exercised control over the apartment or its contents"). The *Amparo* court repeated that "[b]ehavior tending to show that the defendant knew of the presence of drugs in the apartment or that he was guilty of some offense is not sufficient, by itself, to prove that he had the ability and intent to control the drugs." *Commonwealth* v. *Amparo*, *supra* at 924, quoting *Commonwealth* v. *Cruz*, 34 Mass. App. Ct. 619, 623 (1993). I would not disavow these cases. In any event, the evidence of constructive possession in each of them is stronger than the evidence against the defendants here.

"no knock" warrant at 10 P.M. at very small apartment, finding three men, none of whom "lived" there, on bed just inside door, sorting and dividing up cash, in sight of apparatus used to cut and bag cocaine for distribution, and within reach of large quantity of cocaine [$30,000 to $40,000 worth], where expert testimony established that setup of apartment was that of midlevel cocaine distribution network, or "cocaine mill").[4]

The Commonwealth points to evidence that the apartment was "sparsely" furnished, a point relied on by the court. However, there was evidence that one bedroom contained a bed[5]; the kitchen, a table and chairs; and the living room, at least two couches and a television set. While perhaps more utilitarian than luxurious, no weight can appropriately be given to it in the circumstances of this case, at least with respect to these three defendants. In *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 619 (1990), *S.C.*, 410 Mass. 1005 (1991) (*Arias*), presence and knowledge were established, and the court went on to conclude that "[t]here could hardly be more potent evidence of an intention by the defendants to exercise dominion and control of the premises and its contents [drugs] than their presence at an early morning hour [5:45 A.M.] in a heavily barricaded apartment, sparsely furnished and in the absence of either the owner or the tenant."[6] In this case, the hour is 6:30 P.M. (when friends often socialize), the door was not barricaded, a tenant and at least one other person with keys to the apartment were present, and the living room was sufficiently furnished to permit eight people to watch television. In *Arias, supra* at 620, the court noted that the

---

[4]In *Commonwealth* v. *Arias*, 29 Mass. App. Ct. 613, 614-615 (1990), *S.C.*, 410 Mass. 1005 (1991) (*Arias*), the defendants were in possession of cash, among other evidence, when police broke down their barricaded door at 5:45 A.M. As the court noted, the Commonwealth produced evidence that the defendants were "unemployed" at the time. *Id.* at 615 n.4. The Commonwealth introduced no evidence as to the employment status of the defendants in the present case. Mariano Gomez testified that he was a mechanic and owned and operated a garage, which also engaged in towing and used automobile sales.

[5]There was a second bedroom about which the Commonwealth offered no evidence.

[6]In *Arias, supra* at 614-615, the apartment's bathroom was set up with an apparatus to facilitate the quick disposal of drugs, and persons in the apartment were seen throwing drugs out the window as the police forced their way into the apartment.

evidence "cut heavily against" any inference that the defendants were merely casual visitors to the apartment. That is decidedly not the case here.

The Commonwealth also relies on evidence that the police heard "scurrying" in the seconds between announcing their presence and breaking down the door. Here too the court accepts that the evidence supports a conclusion of constructive possession. While the sounds may have given the officers a reason to break down the door, there is no evidence that these defendants caused the scurrying sound. There were, after all, five other individuals in the room, several of whom (not these defendants) had drugs, packaging material, and keys in their physical possession, which, one could reasonably infer, they were attempting to dispose of when the police entered the room. The Commonwealth also contends that the judge could infer from the evidence of scurrying sounds that the two containers (in which the heroin was concealed) were likely open and their contents in plain sight of all the occupants before the police entered the apartment. This inference is mere speculation. In any event, it is principally relevant to the knowledge prong of constructive possession, rather than to whether the defendants were able to and intended to exercise dominion and control over the contents.

The Commonwealth points to the heavy metal chains wrapped in electrical tape that could have been used to fortify the door, if attached, which they were not. This is, of course, probative on the question whether the apartment may have been used for illegal purposes, which it plainly was by someone. It is not evidence that these defendants, in contrast to those who were observed selling drugs there, those who lived there, and those who had keys to the apartment, controlled the drugs found concealed there.[7] Cases in which the existence of barricades has been considered probative on the question whether those in the apartment controlled drugs found there have all involved barricades that were in place when the police arrived. See *Commonwealth* v. *Velasquez*, 48 Mass. App. Ct. 147 (1999) (after barricade broken down, defendant blocked police from entering bathroom where he was flushing

---

[7]Common sense would suggest that if the eight men in the apartment were dividing up the proceeds from drug sales or packaging the drugs when the police arrived, the chains would have been attached. Cf. *Arias, supra.*

toilet); *Arias, supra* at 614-615 (after barricaded door broken down at 5:45 A.M., police found five men, none of whom lived there or was employed, in midst of drugs and mixing materials). See also *Commonwealth* v. *Brown*, 34 Mass. App. Ct. 222 (1993) (sufficient evidence of constructive possession with respect to one guest of tenant in barricaded apartment from which drug sales had been made, whom police found disposing of drugs in toilet and bathtub; however, evidence of intention and ability to control drugs was not sufficient as to another guest who was staying there, was present when police broke down barricade, was aware of drug sales and presence of cocaine, but was not otherwise linked to drugs found in apartment).

In sum, the cases principally relied on by the court, *Pena* v. *Commonwealth*, 426 Mass. 1015 (1998); *Commonwealth* v. *Velasquez, supra*; *Commonwealth* v. *Frias*, 47 Mass. App. Ct. 293 (1999); *Commonwealth* v. *Antonio*, 45 Mass. App. Ct. 937 (1998)[8]; and *Arias, supra*, all presented circumstances notably distinguishable from the present cases, and evidence more probative on the question of constructive possession.[9] The assessment of the adequacy of the evidence of constructive possession depends greatly on the reasonable inferences that can be drawn from the particular facts and circumstances in each case. Here, however, the evidence presented falls far short of what Massachusetts courts have previously considered adequate to support a conviction on that ground. I respectfully dissent.

---

[8]In *Commonwealth* v. *Antonio*, 45 Mass. App. Ct. 937 (1998), the court found that the evidence of constructive possession was sufficient where the defendant was present in a sparsely furnished, highly fortified apartment containing his personal belongings and papers in close proximity to packaged cocaine and cash, and where he attempted to shut the front door to keep police out, and to escape out the back when they successfully gained entry.

[9]The court also cites *Commonwealth* v. *DeJesus*, 48 Mass. App. Ct. 911 (1999), which is not a constructive possession case. In that case, the defendant was tried on the theory that he was a joint venturer in a drug selling operation. The evidence supported a finding that the defendant acted as the lookout for drug sales made from an apartment where he was found with three other occupants, along with heroin packets, packaging material, and money.