## COMMONWEALTH *vs.* KYLE SYLVIA.

Bristol. December 10, 2009. - March 2, 2010.

Present: MARSHALL, C.J., IRELAND, COWIN, CORDY, & GANTS, JJ.

*Homicide. Firearms. Practice, Criminal,* Capital case, Opening statement, Required finding, Argument by prosecutor, Identification of defendant in courtroom, Verdict. *Identification. Evidence,* Identification, Consciousness of guilt, Scientific test, Relevancy and materiality.

At a criminal trial, certain statements in the prosecutor's opening, for which evidence never materialized, did not give rise to a substantial likelihood of a miscarriage of justice, where the record established that the prosecutor reasonably expected to elicit evidence to support those statements; where there was no showing of bad faith or prejudice, especially given that the prosecutor presented his theories to the jury as possible scenarios, not as fact; where the judge correctly instructed the jury that nothing the lawyers said was evidence; and where, in context, the prosecutor correctly stated the law. [187-189]

At the trial of indictments charging the defendant with murder in the first degree and unlawful possession of a firearm, the evidence was sufficient to prove identity, where the fact that two witnesses had seen media coverage of the defendant's arrest before making out-of-court and in-court identifications of the defendant did not impermissibly taint their identifications; where the brevity of the two witnesses' encounter with the defendant, and the fact that they erred in some details and failed to include others, went to the weight of the identifications and not their reliability, whereas testimony of other witnesses was consistent with the two witnesses' testimony, and there was also evidence from which the jury could have inferred consciousness of guilt; and where the Commonwealth presented sufficient evidence to connect the defendant to the clothing involved in the identifications. [189-191]

At a murder trial, the judge did not err in permitting a Commonwealth witness (a State police laboratory chemist) to testify as to the percentage of gunshot powder residue collection kits analyzed in which such residue is detected, where the challenged testimony provided a statistical context from which to examine the contamination theory that the defendant had previously raised, and was also relevant on the matter of possible bias; further, any potential prejudicial effect arising from the prosecutor's use of the challenged testimony in his closing argument did not outweigh the probative value of the testimony, in light of the judge's immediate curative instruction to the jury. [191-193]

At a criminal trial, the judge's forceful instruction sufficiently mitigated any harm arising from the improper injection by the prosecutor in his closing argument of his personal observations or beliefs, or his intimate independent

knowledge; likewise, a single instance of excusable hyperbole in the prosecutor's closing did not warrant a new trial, in light of the judge's immediate curative instruction; finally, no reversible error resulted from the prosecutor's isolated reference to hearsay testimony. [193-195]

A criminal defendant who was convicted of murder in the first degree and unlawful possession of a firearm was not entitled to relief based on his acquittal on an indictment charging the use of body armor during the commission of a felony, an allegedly factual inconsistency. [196-197]

INDICTMENTS found and returned in the Superior Court Department on March 16, 2005.

The cases were tried before *E. Susan Garsh*, J.

*Donald A. Harwood* for the defendant.

*Steven E. Gagne*, Assistant District Attorney, for the Commonwealth.

IRELAND, J. A jury convicted the defendant of murder in the first degree on the theory of deliberate premeditation and of unlawful possession of a firearm.[1] The jury acquitted the defendant of using body armor during the commission of a felony, see G. L. c. 269, § 10D. Represented by new counsel on appeal, the defendant argues (1) error in the prosecutor's opening statement; (2) error in the denial of the defendant's motion for required findings; (3) error in the admission of certain evidence concerning gunshot powder residue laboratory test results; (4) error in the prosecutor's closing argument; and (5) that his convictions of murder in the first degree and unlawful possession of a firearm are inconsistent with his acquittal on the charge of wearing body armor during the commission of a felony. The defendant also seeks relief pursuant to G. L. c. 278, § 33E. We affirm the judgments of convictions. We discern no basis to exercise our authority under G. L. c. 278, § 33E.

*Background.* Based on the evidence, the jury could have found the following facts. At approximately 12:50 P.M., on October 6, 2004, Victoria Dudley and her son Christopher,[2] who was twelve years of age, were walking east on Cove Street in the south end of New Bedford. They passed the victim, Anderson Rosa, who was unknown to them, and who was pacing back

---

[1]On the murder charge, the Commonwealth had proceeded also under a theory of extreme atrocity or cruelty, which the jury rejected.

[2]Because both mother and son share the same surname, where appropriate, we use the first name of the witness.

and forth on the sidewalk outside a house on the corner of Cove Street and Stapleton Street. Across that corner, on Cove Street, was the "station 2" police station, which the New Bedford police department had closed to the public, but utilized as an office for its division of professional standards.

After passing the victim, the Dudleys noticed a man, the defendant, walking quickly westbound toward them, dressed in a bulky, black hooded sweatshirt or jacket, and black pants.[3] Victoria's attention was drawn to the defendant because his clothing seemed inappropriate for that day's warm weather. The defendant came within one foot of Victoria and Christopher. Although the defendant's face was partially obscured by a hood, Victoria had a clear view of his eyes, and Christopher was able to see his face, and observed that the defendant appeared to have a "lazy eye."

After they passed the defendant, Christopher looked back at him and saw him retrieve, with his right hand, a gun from the pocket of his jacket. Christopher then watched the defendant, who was about one to two feet away from the victim, aim the gun at the victim's head and fire. The defendant continued firing at the victim, who fell to the ground.[4] Victoria pushed Christopher to the ground, covering him with her body. Once the shots stopped, the Dudleys stood up and quickly walked away. Before doing so, Christopher saw the defendant run around the corner, turning left on Stapleton Street, heading south.[5]

The victim died at the scene as the result of multiple gunshot wounds. He had been shot six times. Based on the presence of soot and gun powder stippling on the victim's face, the forensic pathologist who conducted the autopsy opined that one of the

---

[3]Victoria's description of the shooter varied from Christopher's in that she recalled that the shooter wore blue jeans.

[4]While Victoria did not observe the defendant fire the first shot, she did see the defendant thereafter repeatedly shoot the victim.

[5]Shortly after the shooting, Victoria and Christopher recognized the defendant in local media coverage. Both Victoria and Christopher saw the defendant in a television broadcast that aired on the evening of the shooting; Christopher also saw, on October 7, 2004, a photograph of the defendant's arrest in a local newspaper. Victoria contacted police on October 7. Subsequently, from photographic arrays administered separately to Victoria and Christopher, both identified the defendant as the person they witnessed commit the shooting. In addition, both Victoria and Christopher made an in-court identification of the defendant.

gunshot wounds to the victim had been inflicted from a distance of between one to three inches from his face. Based on the nature of the victim's wounds, the forensic pathologist testified that the victim would have died within minutes.

People in the vicinity of the shooting heard shots fired. An employee of the New Bedford police department's division of professional standards, who had just left the building, heard shots and saw a person wearing a dark hooded sweatshirt and dark pants run south on Stapleton Street. She alerted Lieutenant Manuel Ortega and Sergeant August Santos. Sergeant Santos proceeded to chase the person on foot. The person took a right, heading west, on Cove Road,[6] at which point Sergeant Santos lost sight of him. A tow truck operator, Derrick Duarte, working on Stapleton Street, observed that a man who ran past him and who turned right, running west on Cove Road, wore black clothing, including a black hooded jacket made by "Carhartt."

One street over, on Margin Street, a resident who was outside in her driveway saw a person dressed in black rush by her and enter the back yard of 1 Margin Street, which is on the corner of Margin Street and Cove Road. The owner of the home on 1 Margin Street, Joan Martin, had resided there for thirty years and knew the defendant. At various times when the defendant was between the ages of thirteen and seventeen, he had resided at Martin's house.[7,8]

Martin was awakened by her security alarm sounding, indicating that the door to her home facing Cove Road had been opened.[9] Soon thereafter, police arrived and asked to enter, which she permitted. In the back yard, around which there was a stockade fence, police found various clothing articles, a bulletproof vest, and a loaded firearm, that Martin claimed did not belong to her or to anyone in her household. Specifically, on the ground by Martin's deck, police found a bulletproof vest and a black hooded jacket made by "Carhartt." In addition, police discovered black

---

[6]Cove Road is to be distinguished from Cove Street.

[7]The defendant had lived at 1 Margin Street as a foster child, but that relationship was kept from the jury.

[8]At the time of the shooting, the defendant lived on McGuirk Street, which was a few blocks east from the shooting.

[9]Earlier, Martin had hung laundry, including jeans and shirts, outside in the back yard on a line across her deck.

sweat pants inside a cooler in the yard. Under a "Burger King" bag and partially inside a drain to the house, police recovered a loaded nine millimeter Glock semiautomatic pistol.[10] Police observed that the basement door to Martin's home, which was not included in her home's alarm system, was ajar.

Meanwhile, State and local police were looking for the shooter and had begun to set up a perimeter in the area. The defendant emerged near the corner of Margin Street and Cove Road, heading east on Cove Road, and wearing different clothing, namely blue jeans and a "Michael Jordan" basketball shirt.[11] The defendant appeared to be out of breath and was perspiring. When asked by Officer Leonard Mota of the New Bedford police department to "Come here," the defendant replied, "What?" and took off running.[12] Officers followed him, but lost sight of him near Shore Street, off Cove Road.

The defendant was next seen by Sergeant Victor Mendes of the New Bedford police department. The defendant was turning left onto South First Street from Cove Road.[13] Sergeant Mendes, who was dressed in plainclothes, approached the defendant, displayed his police badge, and asked the defendant if they could talk. The defendant ran away, jumping over a nearby fence. Sergeant Mendes followed him, but eventually lost sight of him.

The defendant was seen by a State trooper walking north on South First Street. The defendant had discarded his shirt and was bare chested. He was walking quickly and looking down at the ground.

Officer William Sauve saw the defendant at the intersection of Cove Street and South First Street, heading north on South First Street.[14] With two other officers, Officer Sauve followed the defendant and eventually caught up with him on Jennings Court. The officers told the defendant to stop and to place his hands where they could see them. The defendant complied and was taken into custody.

---

[10]There was one live cartridge in the chamber of the firearm and one live cartridge remaining in its magazine, which could hold a maximum of ten cartridges.

[11]The officer who spotted the defendant in this location, Sergeant Santos, made an in-court identification of him.

[12]Officer Mota made an in-court identification of the defendant.

[13]Sergeant Mendes made an in-court identification of the defendant.

[14]Officer Sauve made an in-court identification of the defendant.

The defendant was taken to the New Bedford police department, where his hands were tested for the presence of gunshot powder residue. The officer who conducted the test, Detective Robert Gonneville, informed the defendant that the State police would be performing some additional tests on him. Because the defendant earlier had asked to use the bathroom, Detective Gonneville told Sergeant Kristofer Winterson, in the defendant's presence, that he could escort the defendant to the bathroom, but could not allow the defendant to wash his hands because another test was going to be conducted. While in the bathroom, Sergeant Winterson observed the defendant urinate on his hands over the toilet. The defendant rubbed his hands together in his urine as if he were washing them.

Three particles of gunshot powder residue were detected on the backs of the defendant's hands. The defendant tested positive for the presence of blood on the palms of both his hands, and on the webbing between the fingers of both his hands.

Seven discharged cartridge casings were recovered from the sidewalk near the victim's body. A State trooper with the firearms identification unit concluded that, based on his microscopic examination, the discharged cartridge casings recovered near the victim all came from the Glock pistol found at 1 Margin Street.

Regarding the clothing recovered at 1 Margin Street, inside the black sweatpants (which had been found in the cooler), police discovered an identification card and a letter addressed to the defendant. Inside the pockets of the black Carhartt jacket, another letter relating to the defendant, as well as a magazine containing six live cartridges, were found. The magazine could hold a maximum of ten cartridges.

The defendant did not testify. Through cross-examination of the Commonwealth's witnesses, the defense faulted police with various aspects of their investigation. The defense argued that the case was one of misidentification, and that the identification evidence was not reliable.

*Discussion.* 1. *Prosecutor's opening statement.* In his opening statement, the prosecutor stated:

> "[W]e might learn why [the defendant] murdered [the victim], but I doubt it. We might learn that maybe it was a drug deal. [The victim] was found with some cash [and a]

small amount of crack cocaine in his pocket. Or maybe it was over a girl friend, or maybe it was some macho thing or some other question. Who can get inside another man's head? We might learn. It would be nice, but it's not necessary."

The defendant did not object. He now argues on appeal that the statements were improper, requiring reversal, because they were not followed by supporting evidence and were not advanced in good faith.

"The proper function of an opening is to outline in a general way the nature of the case which the counsel expects to be able to prove or support by evidence." *Commonwealth* v. *Croken*, 432 Mass. 266, 268 (2000), quoting *Commonwealth* v. *Fazio*, 375 Mass. 451, 454 (1978). The prosecutor's expectation must be "reasonable and grounded in good faith." *Commonwealth* v. *Fazio, supra* at 456. "Absent a showing of bad faith or prejudice . . . the fact that certain evidence fails to materialize is not a ground for reversal." *Commonwealth* v. *Qualls*, 440 Mass. 576, 586 (2003), citing *Commonwealth* v. *Errington*, 390 Mass. 875, 883 (1984). Where, as here, defense counsel did not object to the statements, we review to determine whether any misconduct created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Silva*, 455 Mass. 503, 514 (2009).

Here, on the subject of the victim's death resulting from a possible drug deal, the prosecutor questioned the victim's grandmother concerning her knowledge of the victim's use or sale of drugs. During a sidebar conference held after the defendant's objection, defense counsel acknowledged that he expected evidence of drugs found in the victim's pocket to be introduced. While that evidence may not have materialized,[15] there was evidence, solicited by the prosecutor, that, at the time of the victim's death, he had marijuana in his system.

On the subject of a dispute concerning a girl friend serving as

---

[15] A certificate of drug analysis, marked as exhibit no. 88, is included among the trial exhibits. In this certificate, Kenneth W. Gagnon, a chemist with the State police, concluded that a substance of "0.73 grams white 'rock' powder in five tied plastic bags," which was found on the victim, was comprised of "crack" cocaine. While the certificate is included among the exhibits, there appears to be no indication in any of the transcripts of when this exhibit was admitted in evidence, and the parties have not provided information concerning the circumstances of its admission, namely, whether it was admitted with

a possible motive for the victim's murder, the prosecutor explored this topic through questioning the defendant's then girl friend about a tattoo he once had on his neck bearing the name "Heidi." During the sidebar conference that followed, defense counsel acknowledged that he was aware of the Commonwealth's attempts to investigate this possible motive before trial by asking the victim's relatives about a Heidi.

Thus, as to the challenged statements, the record establishes that the prosecutor reasonably expected to elicit supporting evidence. There is no showing of bad faith or prejudice. Indeed, the fact that the prosecutor "presented his theories to the jury as possible scenarios, not as fact," *Commonwealth* v. *Lucien*, 440 Mass. 658, 666 (2004), underscores the remote possibility of any prejudice. In addition, the judge correctly instructed the jury before the opening statements that, "Nothing the lawyers say is evidence," and repeated this instruction in her final instructions to the jury. Further, the prosecutor's statements must be construed in context. The point the prosecutor was attempting to make was that he is not required to prove motive. That point is a correct statement of law. See *Commonwealth* v. *Carlson*, 448 Mass. 501, 508-509 (2007). There was no error.

2. *Motion for required findings.* The defendant argues error in the judge's denial of his motion for a required finding of not guilty made at the close of the Commonwealth's case. The defendant first contends that the Commonwealth's proof was insufficient to sustain the convictions because the identification evidence was unreliable. He points to the fact that the Dudleys made their identifications only *after* viewing media coverage of the defendant's arrest, see note 5, *supra*, arguing that this timing rendered their identifications unreliable. He further attacks the reliability of the identifications, asserting that the Dudleys saw the shooter briefly, saw only his eyes because of the hood worn, and made no mention of his numerous tattoos.[16] The

or without an objection. Because the Commonwealth is not required to prove motive, whether the substance found on the *victim* was, in fact, "crack" cocaine was not a matter that played a role in the Commonwealth's case and does not implicate the principles set forth in *Melendez-Diaz* v. *Massachusetts*, 129 S. Ct. 2527, 2532 (2009) (where admission of certificate of drug analysis critical to prove element of crime against defendant).

[16]Photographs of the defendant entered in evidence depict a fairly large tattoo on his neck. They also show tattoos on his arms, chest, back, and trunk.

defendant adds that Victoria's description of the shooter's height was incorrect.[17]

Under the applicable test, see *Commonwealth* v. *Latimore*, 378 Mass. 671, 677 (1979), we conclude that the Commonwealth's evidence was sufficient to prove identity. Both Victoria and Christopher positively identified the defendant as the shooter both out of court (in a photographic array) and in court. We reject the defendant's claim that these identifications were impermissibly tainted because the Dudleys first saw media coverage of the defendant's arrest (a television broadcast and a newspaper photograph). "[I]n some circumstances an identification that has been tainted, but not by the government, may become so unreliable that its introduction into evidence is unfair." *Commonwealth* v. *Odware*, 429 Mass. 231, 236 (1999). Because there is no police participation in the identification, exclusion cannot be advanced under constitutional principles, but may be based on common-law principles of fairness. *Commonwealth* v. *Jones*, 423 Mass. 99, 109 (1996). See *Commonwealth* v. *Bly*, 448 Mass. 473, 493 n.16 (2007). In *Commonwealth* v. *Jones*, *supra* at 109-110, we distinguished the circumstances presented in that case from "a casual confrontation in neutral surroundings, such as occur through the media," which is what is present here. Additionally, in the present case, the media depictions of the defendant differed from how he appeared at the time of the shooting. Namely, the defendant no longer wore a black hooded jacket and black sweatpants, but rather, was bare chested and wore blue jeans. The judge instructed the jury concerning eyewitness identification testimony, and the Dudleys were subject to cross-examination. See *id.* at 110. The circumstances here "do not equate to the degree of unreliability described in the *Jones* case." *Commonwealth* v. *Bly*, *supra* at 495.

Concerning the reliability of the Dudleys' in-court identifications, while Victoria testified that she recalled the shooter's eyes, that was not the only detail she was able to remember. She also recounted correctly the fact that the shooter wore a black hooded sweatshirt or jacket, having paid particular attention to that detail because it appeared to her to be unusual in

---

[17]The defendant did not move to suppress the identifications prior to trial. His counsel was not ineffective in failing to do so because the motion, if filed, would properly have been denied.

view of the warm weather. Also, the defendant overlooks the fact that Christopher saw the shooter's face. Both witnesses observed the shooter just before and during the shooting. That the encounters were brief, and that certain details were erroneous or lacking, were matters for the jury to evaluate. See *Commonwealth v. Robinson*, 451 Mass. 672, 681 n.12 (2008); *Commonwealth v. Clary*, 388 Mass. 583, 589 (1983); *Commonwealth v. Hoffer*, 375 Mass. 369, 377 (1978). Testimony of other witnesses, particularly with respect to the clothing initially worn by the shooter, and the direction in which he fled after gunshots were heard, furnished further proof that the defendant was the shooter and was consistent with the testimony provided by the Dudleys. See *Commonwealth v. Qualls*, 440 Mass. 576, 582 (2003); *Commonwealth v. Castro*, 438 Mass. 160, 165 (2002). Finally, there was evidence from which the jury could have inferred consciousness of guilt, including evidence that the defendant fled the scene and fled from police, as well as evidence that, after learning that he was going to be subjected to further testing, the defendant urinated on his hands. See *Commonwealth v. Castro, supra.*

We reject the defendant's contention that the Commonwealth failed to "tie to the defendant" the clothing recovered from the back yard of 1 Margin Street. There was testimony that, inside the black hooded jacket and black sweatpants, police found two letters, an envelope, and an identification card on which the defendant's name appeared, thereby permitting an inference that the clothing belonged to him. The credibility of this evidence, contrasted to the defendant's theory (unsupported by evidence) that those items of identification "more likely were recovered by police from the defendant's wallet and personal possessions upon arrest," was a matter for the jury's determination. See *Commonwealth v. Robinson, supra.* Similarly, whether the "scant" gunshot residue found on the defendant's hands was reliable in view of possible contamination, again, was a matter for the jury to decide. The defendant's arguments ignore that, under the *Latimore* standard, we are to view the evidence in a light most favorable to the prosecution, see *Commonwealth v. Latimore, supra,* and that the "weight and credibility of the evidence is the province of the jury," *Commonwealth v. Gomez*, 450 Mass. 704, 711 (2008).

3. *Admission of evidence concerning laboratory test results*

*for gunshot powder residue.* Over the objection of defense counsel, the Commonwealth's chemist, John E. Drugan, testified that, in testing at the State police crime laboratory, gunshot powder residue is detected in twenty to twenty-five per cent of gunshot power residue collection kits analyzed, and is not detected in seventy-five to eighty per cent of kits analyzed. The defendant argues that this testimony should have been excluded because it was irrelevant. He explains that this testimony had nothing to do with a positive finding of gunpowder residue in the defendant's case, and that the defense did not raise an issue of contamination with regard to the Commonwealth's laboratory. He further asserts, for the first time on appeal, that this testimony was unduly prejudicial, particularly in view of how the prosecutor used it in his closing argument.

"Whether evidence is relevant and whether its probative value is substantially outweighed by its prejudicial effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." *Commonwealth* v. *Simpson*, 434 Mass. 570, 578-579 (2001). There was no error. In view of the fact that the defense, during the cross-examination of Detective Gonneville, had raised the issue of possible contamination with regard to the gunshot powder residue testing of the defendant at the police station, it was reasonable for the prosecutor to anticipate that the issue of contamination might be raised during Drugan's cross-examination (and indeed it was[18]). The challenged testimony from Drugan was relevant because it provided a statistical context from which to examine the contamination theory, for if contamination were prevalent, one might reasonably expect gunshot powder residue detection rates to be much higher than they were. In addition, as reasoned by the judge, the challenged testimony was relevant on the matter of possible bias. That is, it countered any claim that the chemists at the State laboratory manipulated testing to obtain positive detection rates. While the better practice would have been for the judge to give a limiting instruction to the jury concerning the use of the testimony, the defendant did not request one and it later was made clear to the jury, as will soon be explained, in

---

[18]Defense counsel elicited testimony from Drugan that he could not control how materials were collected and if they were contaminated prior to being submitted to the laboratory for testing.

an instruction given during the prosecutor's closing argument, that the testimony had a limited purpose.

The defendant argues that the prosecutor's use of the challenged testimony underscores its prejudicial effect. During his closing argument the prosecutor started to use Drugan's testimony to suggest that it rendered the positive finding in the defendant's case all the more credible.[19] The judge, however, interrupted him and immediately instructed the jury:

> "Let me tell you, the information with respect to the percentage of gunshot residue was admitted only in connection with your evaluation of the laboratory and whether [it] consistently came up with a certain result or not; and therefore, whether the laboratory procedures are ones that you may find credible. The percentage that the laboratory may find is not otherwise relevant to any issues to whether this defendant committed any of the offenses."

The prosecutor then moved on to a different topic in his summation. In these circumstances, we conclude that any potential prejudicial effect of the challenged testimony did not outweigh its probative value. See *id.* at 579.

4. *Prosecutor's closing argument.* The defendant argues that the prosecutor made a number of improper remarks in his closing argument. "Remarks made during closing arguments are considered in context of the whole argument, the evidence admitted at trial, and the judge's instructions to the jury." *Commonwealth* v. *Whitman,* 453 Mass. 331, 343 (2009). Before closing arguments commenced, the judge instructed the jury that the closing arguments of counsel are not evidence. She repeated this instruction in her final charge to the jury.

a. We first take up the defendant's contention that the prosecutor improperly commented on the defendant's appearance when he stated, "I know that [the defendant] doesn't quite look the same today, I know that his hair . . . ." Because the defendant objected to this statement, we review to determine whether the

---

[19]The prosecutor argued: "John Drugan told you that gunshot residue tests from that lab [come back positive] only twenty to twenty-five per cent of the time . . . seventy-five to eighty per cent of the time nothing, no gunshot residue. His [the defendant's] came back positive. His came back positive on both hands. . . . He's got it three times, twice on one hand, once on the other."

remark was improper and, if so, whether it was harmless. See *id.* at 344.

The prosecutor should not have injected his personal observations or beliefs, or intimate independent knowledge, by employing the words "I know" in his argument. See *Commonwealth* v. *Caillot*, 454 Mass. 245, 259 (2009), quoting *Commonwealth* v. *Wilson*, 427 Mass. 336, 352 (1998) (prosecutor may not express personal beliefs and may not indicate that he has knowledge independent of evidence before jury). In any event, the judge immediately sustained the objection and ordered the comment struck. She then gave a forceful instruction stating that the language was improper and was to be disregarded. Any harm from this isolated comment was sufficiently mitigated. *Commonwealth* v. *Coren*, 437 Mass. 723, 731 n.8 (2002).

b. The defendant argues that reversal is required on account of the following remarks made by the prosecutor:

> "Now, I suggest to you that what is most astounding of all is that defense counsel suggests to you, if I understand him correctly, or insinuates, that one or more police officers planted identification evidence on the clothing found [at 1 Margin Street]. He would have you believe and accept that premise, in essence, convict the police of reprehensible . . . ."

Defense counsel interrupted, objecting to the argument. The judge sustained the objection and instructed the jury:

> "There's no issue with respect to any police in general. The question for you is: Did the Commonwealth meet its burden of proof? And you can analyze what inference can be drawn from the actions or lack of actions of the specific police officers who were before you."

The import of defense counsel's closing argument was that, once the defendant had been booked,[20] police officers *may* have returned to 1 Margin Street and placed the identification evi-

---

[20]Police inventoried items taken from the defendant when he was booked (a wallet, keys, a ring, a belt). These items are to be distinguished from the so-called "identification" evidence, which consisted of two letters addressed to the defendant and an identification card in his name.

dence inside the black jacket and sweatpants. The prosecutor was entitled to respond to this argument, see *Commonwealth* v. *Whitman, supra* at 346, and the challenged remarks served to do so. Although the prosecutor should not have made the remark about "convict[ing] the police," we do not review the remark as equating to an improper "conspiracy" theory, see *Commonwealth* v. *Thomas,* 401 Mass. 109, 116 (1987). In the circumstances, the isolated remark does not warrant a new trial. "Excusable hyperbole is not a ground for reversal, and the jury 'are presumed to have a certain measure of sophistication in sorting out excessive claims on both sides.' " *Commonwealth* v. *Ruiz,* 442 Mass. 826, 835 (2004), quoting *Commonwealth* v. *Wilson, supra* at 350. Here, the judge immediately sustained the defendant's objection and gave a specific curative instruction. See *Commonwealth* v. *Coren, supra.* We presume the jury will follow the judge's instructions. *Commonwealth* v. *Pope,* 406 Mass. 581, 588 (1990).

c. Contrary to the defendant's contention, no reversible error resulted from the prosecutor's isolated reference to hearsay testimony. Specifically, the prosecutor referenced Victoria's comment to a police officer that, just before the shooting occurred, the victim "look[ed] like something was wrong." There was no objection by the defendant, which "provide[s] some guidance as to whether [this] particular argument was prejudicial in the circumstances," *Commonwealth* v. *Kozec,* 399 Mass. 514, 518 n.8 (1983).[21] The judge, however, immediately interrupted the prosecutor and instructed the jury to disregard the statement. She also instructed that the statement had not been admitted for its truth, and that "a witness's opinion [regarding] what is in someone's else's mind, is also not evidence in this case." This curative instruction, taken together with the judge's standard instructions preceding and following the closing arguments, that the closing arguments of counsel are not evidence, mitigated any possible prejudice. *Commonwealth* v. *Coren, supra* at 731 & n.8. No substantial likelihood of a miscarriage of justice occurred. See *Commonwealth* v. *Whitman, supra* at 346-348.

---

[21]Defense counsel may not have considered the remark improper because he had elicited testimony from Victoria that the victim looked "suspicious" right before the shooting.

5. *Inconsistent verdicts.* We reject the defendant's argument that his convictions cannot stand because they are inconsistent with his acquittal on the charge of wearing body armor during the commission of a felony. He bases his argument on the fact that both the firearm and the bulletproof vest "were discarded by the same shooter in the same yard at 1 Margin Street." Significantly, the defendant does not present an argument that the verdicts are legally inconsistent. See *Commonwealth* v. *Gonzalez,* 452 Mass. 142, 151 n.8 (2008) (explaining difference between factually inconsistent verdicts and legally inconsistent verdicts). A legally inconsistent verdict arises "when there exists no set of facts that the government could have proved in the particular case that would have resulted in the verdict at issue." *Id.* Factually inconsistent verdicts, on the other hand, "occur when two or more verdicts in a single case, considered together, suggest inconsistent interpretations of the evidence presented at trial." *Id.* "[A] defendant is not entitled to relief where a jury returns factually inconsistent verdicts." *Commonwealth* v. *Elliffe,* 47 Mass. App. Ct. 580, 584 (1999). Indeed, "the rule is well established in criminal cases that mere inconsistency in verdicts, one of which is an acquittal, will not render the verdict of guilty erroneous even though such inconsistency may have indicated the possibility of compromise on the part of the jury." *Commonwealth* v. *Scott,* 355 Mass. 471, 475 (1969). See *Commonwealth* v. *Medeiros, ante* 52, 57 (2010). Because the defendant advances an argument based on factually inconsistent verdicts, he is not entitled to relief.

While we need not comment further, contrary to the defendant, we do not view the verdicts as factually inconsistent. The jury could have permissibly acquitted the defendant on the charge of wearing body armor during the commission of a felony based on the absence of witness testimony indicating that the shooter wore a bulletproof vest or based on the absence of identifying information on or within the garment itself (in contrast to the sweatpants and Carhartt jacket). In addition, or alternatively, the defendant had very short hair, and there was evidence solicited during the defense's cross-examination of a chemist that hairs retrieved from the bulletproof vest were as long as five, seven, and eleven inches. In light of this evidence, and the fact that there were numerous articles of clothing and other

items in Martin's yard, the jury permissibly could have concluded that the vest did not belong to the defendant.

6. *Relief pursuant to G. L. c. 278, § 33E.* We have examined the record pursuant to our duty under G. L. c. 278, § 33E, and discern no basis on which to grant the defendant relief.

*Judgments affirmed.*