NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

25-P-433

COMMONWEALTH

vs.

FRANK MWAURA.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

Following a jury trial in the Superior Court, the defendant, Frank Mwaura, was convicted of rape.  The defendant appeals, claiming that the judge abused his discretion in admitting a redacted recording of a 911 call, defense counsel was ineffective, the admission of a substitute analyst's opinion testimony violated his confrontation clause rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights, and the judge considered improper factors at sentencing.  We affirm.

Background.  On October 3, 2015, the victim attended a friend's birthday party at a restaurant and later the group gathered at the defendant's apartment.  The victim had been

drinking alcohol prior to the party and continued to drink throughout the night. At the defendant's apartment, the victim fell asleep on a couch in the living room and then was moved onto a futon in a different room to "sleep it off." B.W., who is a nurse, checked on the victim periodically.

Later that night, B.W. and another guest, A.M., opened a door looking for B.W.'s coat. B.W. "saw thrusting motion on the couch," and closed the door quickly believing it was one of the couples at the party. When she realized that it was the room the victim had been in, she reopened the door. A.M. saw the defendant, with his pants down, "on top of" the victim, who was half naked and not awake. The defendant then got up and slammed the door shut. When they were able to open the door again, B.W. saw that the defendant's "pants were down to his ankles."

After the defendant left the room, B.W. tried to help the victim; she was unable to wake her. During this time, A.M. called 911. Police officers arrived and were met by approximately fifteen people. Officer Jessica Cortes saw that the victim was "unconscious, passed out, laying partially on her side face down." She saw that the victim's dress was pulled down, exposing her breasts, and had also been pulled up, and was "barely covering [the victim's] bottom." She also saw the victim's undergarments on the floor. Cortes tried to wake the

2

victim by yelling and shaking her but was unsuccessful. Paramedics arrived and were also unable to wake the victim.

The victim testified that the next thing she recalled after arriving at the defendant's apartment, was waking up in the hospital. At the hospital, she underwent a sexual assault nurse examiner examination (exam). The exam has a standardized kit with envelopes to collect samples and can take three to eight hours to complete. The nurse who conducted the exam explained that she determines what samples need to be collected by asking the patient what happened. Here, the nurse collected all the samples available in the exam kit "because [the victim] really didn't have a memory of what happened." After completing the exam, the nurse notified the police who took possession of the kit.

The kit was then submitted to the Massachusetts State Police crime lab (lab) for testing. Kelley King, a forensic scientist, testified that she begins the testing process by reading the incident report to develop a testing plan of "what items [she is] going to examine and what [she is] going to examine them for." Here, King planned to test the "vaginal swabs, the external genital swabs, the anal rectal swabs, . . . peri-anal swabs and the oral swabs," for sperm cells. Sperm cells were found on the vaginal swabs, external genital swabs, and the anal rectal swab. The peri-anal swabs were ultimately

3

not tested because of the assumption that those swabs would offer the same results as the anal rectal swab.  King then preserved the vaginal swab sample and the anal rectal swab sample for deoxyribonucleic acid (DNA) analysis.[1]

Kathleen Gould, a technical reviewer in the lab's DNA unit, reviewed DNA analysis on the vaginal swabs and the anal rectal swabs.  The technical reviewer's responsibility is to "ensure that the results and conclusions are scientifically support[ed] by the data."  Gould reviewed the "testing procedure for both the vaginal swab and anal rectal swabs through quantitation," which is a "measurement that estimates how much DNA was recovered from the extraction."[2]  She also reviewed the STR[3] analysis for the anal rectal swabs through detection, where the DNA is separated and assigned certain identifying numbers so the DNA profile can then be compared to the DNA profile of a known individual.  DNA profiles were generated for the victim and the defendant for comparison to the DNA profile on the anal rectal swab.

---

[1] DNA analysts compare a DNA profile from an item of evidence to the DNA profile of a known individual "to determine if that person may have been the source of that DNA."

[2] Extraction is "where heat and chemicals are used to . . . break open the cells to release the DNA."

[3] STR analysis is "conventional DNA testing that detects both male and female DNA."

Two DNA profiles were found from the anal rectal swab:  a sperm fraction and a non-sperm fraction.  In the sperm fraction, a "male DNA profile was obtained and that profile matched the profile of [the defendant]."  The expected frequency of the "occurrence of this DNA profile is approximately 1 in 11.17 sextillion unrelated individuals."  Diane Biagiotti, the DNA analyst who analyzed the vaginal swab, also found that the DNA profile for the sperm fraction matched the defendant's DNA profile.  The expected frequency of occurrence of this YSTR profile was "approximately 1 in 1,337 male individuals."[4]

Discussion.  1.  911 call.  Prior to trial, a hearing was held on motions in limine filed by the parties.  As relevant here, the judge allowed the Commonwealth's motion to admit the recording of A.M.'s 911 call in evidence, with some redactions.  Defense counsel objected to the admission of the recording at the motion hearing and again before it was played during trial.  On appeal, the defendant argues that the judge abused his discretion in admitting the 911 call because "much of the content was cumulative, overly prejudicial, and highly inflammatory."  "Whether evidence is relevant and whether its probative value is substantially outweighed by its prejudicial

---

[4] Biagiotti testified that she used "YSTR testing," a variation of DNA profiling often used where there is "a considerable amount of female DNA and a smaller amount of male DNA."

5

effect are matters entrusted to the trial judge's broad discretion and are not disturbed absent palpable error." Commonwealth v. Sylvia, 456 Mass. 182, 192 (2010), quoting Commonwealth v. Simpson, 434 Mass. 570, 578-579 (2001).

> "When assessing whether the risk of unfair prejudice outweighs the probative value of the challenged evidence, the factors a reviewing court considers may include (1) whether the trial judge carefully weighed the probative value and prejudicial effect of the evidence introduced at trial . . . ; (2) whether the judge mitigated the prejudicial effect through proper limiting instructions . . . ; (3) whether the challenged evidence was cumulative of other admissible evidence, thereby reducing the risk of any additional prejudicial effect . . . ; and (4) whether the challenged evidence was so similar to the charged offense as to increase the risk of propensity reasoning by the jury."

Commonwealth v. Peno, 485 Mass. 378, 386 (2020).

Here, the judge excluded several statements from the 911 call,[5] demonstrating that he "carefully weighed the probative value and prejudicial effect of the evidence introduced at trial." Peno, 485 Mass. at 386. Additionally, it was not improper for the judge to admit the recording due to it being "cumulative." "[T]he prejudicial effect of cumulative spontaneous utterance evidence is mitigated where the person who made the out-of-court statements testifies at trial and is subject to cross-examination about her prior statements."

_____

[5] The judge excluded the statement that the defendant was "basically raping [the victim]," and the statements of the 911 operator "that's awful." Other portions of the 911 call were excluded as cumulative and "bordering on investigative."

6

Commonwealth v. Davis, 54 Mass. App. Ct. 756, 764 (2002).  What is more, the recording was corroborative of A.M.'s testimony and therefore it "did not create a risk of unfair prejudice because [A.M.] was subject to cross-examination about those statements." Commonwealth v. Sanchez, 96 Mass. App. Ct. 1, 9 (2019).  In sum, the judge properly balanced the prejudicial effect of the proposed evidence against its probative value, and we see no palpable error.  See Sylvia, 456 Mass. at 192.

2.  Ineffective assistance of counsel.  The defendant argues that defense counsel's failure to object to evidence of anal penetration was "deficient performance" and "resulted in material prejudice."  When attempting to establish a claim of ineffective assistance of counsel, a defendant "bears the burden of proving entitlement to a new trial by showing that the behavior of counsel fell below that of an ordinary, fallible lawyer and that such failing 'likely deprived the defendant of an otherwise available, substantial ground of defence.'" Commonwealth v. Comita, 441 Mass. 86, 90 (2004), quoting Commonwealth v. Saferian, 366 Mass. 89, 96-97 (1974).

Here, the claim is presented in its "weakest form," as it is asserted for the first time on direct appeal (citation omitted).  Commonwealth v. Zinser, 446 Mass. 807, 811 (2006). See id. at 810 ("preferred method for raising a claim of ineffective assistance of counsel is through a motion for a new

7

trial"). Where the defendant raised the claim in this way, he will be entitled to relief only "when the factual basis of the claim appears indisputably on the trial record." Commonwealth v. Davis, 481 Mass. 210, 223 (2019), quoting Commonwealth v. Gorham, 472 Mass. 112, 116 n.4 (2015).

Notwithstanding, where the defense strategy at trial was not that the defendant did not penetrate the victim with his penis, but that he was too intoxicated himself to form the mental state required to commit the crime of rape, we could discern strategic reasons for defense counsel's failure to object. Because the record is not developed on this point, we are unable to discern the basis for defense counsel's failure to object, however, and the defendant's ineffective assistance claim therefore fails. See Zinser, 446 Mass. at 811-812.

Moreover, the claim would have failed as the objection would have been futile. See Commonwealth v. Collins, 470 Mass. 255, 261 (2014) (failure to make futile objection is not ineffective). Testimony regarding uncharged acts is permissible where such acts are "inextricably intertwined" with the description of the events forming the basis on which the defendant was charged. Commonwealth v. Fernandes, 492 Mass. 469, 484 (2023), quoting Commonwealth v. Bryant, 482 Mass. 731, 734 (2019). Here, the evidence of anal penetration was part of a single course of conduct and therefore was part of the

8

description of the charged conduct, thus it was permissible for the Commonwealth to present this evidence.  See Commonwealth v. Samia, 492 Mass. 135, 148 (2023) ("Commonwealth is entitled to 'show the whole transaction of which the crime was a part'" [citation omitted]).

3.  Substitute analyst.  At trial, defense counsel objected to the technical reviewer's, Gould's, testimony, arguing that Gould was a "substitute witness," and that the prosecutor did not give notice of the Commonwealth's intention to rely on a substitute expert witness.  On appeal, relying on Smith v. Arizona, 602 U.S. 779 (2024), the defendant argues that Gould's testimony violated his confrontation clause rights under the Sixth Amendment to the United States Constitution and art. 12 of the Massachusetts Declaration of Rights.[6]  Assuming, without

_____

[6] The Supreme Judicial Court recently interpreted Smith in Commonwealth v. Gordon, 496 Mass. 554 (2025).  In Smith, a "substitute expert gave an opinion identifying the controlled substance.  The substitute expert performed the technical and administrative reviews of the original analyst's work . . . . [T]he substitute expert testified to the contents of the analyst's notes. . . .  [T]he substitute expert's opinion . . . 'merely replicate[d], rather than somehow buil[t] on, the testing analyst's conclusions."  Gordon, supra at 555, quoting Smith, 602 U.S. at 798-799.  The United States Supreme Court concluded that if the absent analyst's statements were being offered for their truth and were testimonial, their admission violated the confrontation clause.  See Smith, supra at 783.  Applying Smith, the Supreme Judicial Court concluded in Gordon that the absent analyst's statements were testimonial and the "substitute expert's opinion founded on the truth of the absent

9

deciding, that it was error for Gould to testify as to the original analyst's results, we conclude that any error was harmless beyond a reasonable doubt. This is because there was ample evidence, apart from Gould's testimony, from which the jury could have found that the defendant penetrated the victim with his penis and that he was aware that the victim was not capable of consenting to his doing so.

"An error may be considered harmless when other properly admitted evidence of guilt is so 'overwhelming' as to nullify any effect that the improperly introduced evidence might have had on the outcome" (citation omitted). Commonwealth v. Ramsey, 466 Mass. 489, 494 (2013). In evaluating whether the admission of evidence was harmless beyond a reasonable doubt,

> "we examine factors such as 'the importance of the evidence in the prosecution's case; the relationship between the evidence and the premise of the defense; who introduced the issue at trial; the frequency of the reference; whether the erroneously admitted evidence was merely cumulative of properly admitted evidence; the availability or effect of curative instructions; and the weight or quantum of evidence of guilt.'"

Id., quoting Commonwealth v. Mendes, 463 Mass. 353, 359 (2012).

"To prove the defendant guilty of rape, the Commonwealth had to show that the defendant compelled the victim to submit to sexual intercourse by force or threat of force and against the

---

analyst's statements, was not harmless beyond a reasonable doubt." Gordon, supra at 556.

victim's will."  Commonwealth v. Gibson, 488 Mass. 854, 857 (2022), citing G. L. c. 265, § 22 (b).  The Commonwealth may establish force by proving penetration and that "the defendant knew or reasonably should have known that the victim lacked the capacity to consent."  Gibson, supra.  Where the victim "lacks the capacity to consent, the Commonwealth 'has no obligation to prove the use of force by the defendant beyond what is required for the act of penetration.'"  Id., quoting Commonwealth v. Blache, 450 Mass. 585, 594 (2008).

Under the unusual circumstances presented here, where there were eyewitnesses to the assault, the element of penetration can be inferred.  See Gibson, 488 Mass. at 857.  Specifically, when B.W. and A.M. opened the door to the room the victim was in, A.M. saw "movement," and the defendant with his pants down "on top of" the victim.  A.M. also saw that the victim was "half naked" and "not moving."  B.W. saw a "thrusting motion on the couch," and that the defendant's pants were "down to his ankles."  Additionally, Cortes saw that the victim's dress was pulled down, exposing her breasts, and had also been pulled up, and was "barely covering [the victim's] bottom."  She also saw the victim's undergarments on the floor.  These facts could lead a reasonable jury to conclude that the defendant penetrated the victim.  See id.

11

Moreover, the Commonwealth did not solely rely on Gould's testimony to prove that penetration occurred beyond a reasonable doubt. "An assertion [of harmless error] . . . is most particularly vulnerable where the over-all strength of the Commonwealth's case radiates from a core of tainted evidence" (citation omitted). Commonwealth v. Muniz, 456 Mass. 166, 169 (2010). The testimony of the analyst who tested the vaginal swab is not at issue here. Biagiotti testified to how she conducted the DNA analysis of the vaginal swab and concluded that the DNA profile of the sperm fraction matched the defendant's profile. Therefore there was ample evidence presented by the Commonwealth to prove penetration.

The defendant argues that Gould's testimony "undermined the defense theory" that he was too intoxicated to understand whether the victim was able to consent. However, based on eyewitness observations, a reasonable jury could have concluded that the defendant knew or reasonably should have known the victim was unable to consent. When A.M. and B.W. asked the defendant what he was doing, he tried to push them out of the room and said he was not doing anything. When the pair was able to reopen the door after the defendant slammed it shut, he "ran out of the room." The arresting officer testified that the defendant said "arrest me" several times and saw that he did not have trouble standing up nor did he have slurred speech. A

12

reasonable jury could have concluded that the Commonwealth had met its burden of proving the elements of the crime even without Gould's testimony, and we are satisfied that Gould's testimony did not affect the verdict.  See Ramsey, 466 Mass. at 494.

4.  Sentencing.  We review a sentence "to determine whether it is unconstitutional."  Commonwealth v. Perez, 477 Mass. 677, 682 (2017), S.C., 480 Mass. 562 (2018).  "We do not review the judge's discretion but inquire only whether the sentence was tainted by error of law."  Commonwealth v. Vega, 54 Mass. App. Ct. 249, 250 (2002).  Here, we discern no such error.

The defendant contends that his sentence should be vacated because the "judge's comments [during the sentencing hearing] suggest consideration of improper factors."  The defendant was sentenced to from nine to eleven years, which was more than the range suggested by the sentencing guidelines.  The judge explained why he exceeded the guidelines at the hearing noting the "violent nature of . . . a penile/vaginal penetration" assault, the "cruelty of this rape, the victim being especially vulnerable by circumstances, and the defendant violently imposing his will on a defenseless victim."  The defendant argues that the judge's remarks "suggest he based his decision on personal feelings and emotions generated by the case," and therefore, the sentence should be vacated.

13

However, "[w]e do not read these remarks as reflecting anything other than a consideration of [the] 'nature of the offense and the circumstances surrounding the commission of the crime,'" which are permissible factors to consider. Commonwealth v. Dora, 57 Mass. App. Ct. 141, 149 (2003), quoting Commonwealth v. Coleman, 390 Mass. 797, 805 (1984). Additionally, the judge gave a lesser sentence than the prosecutor requested, suggesting that the judge did not make the decision based on his personal feelings and emotions. See Commonwealth v. Oquendo, 83 Mass. App. Ct. 190, 195 (2013). For these reasons, the sentence was not unconstitutional.

Judgment affirmed.

By the Court (Blake, C.J., Hand & Toone, JJ.[7]),

Clerk

Entered: January 15, 2026.

---

[7] The panelists are listed in order of seniority.

14